**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MICHAEL A.,[1]                                            Case No.1:22-cv-550

                    Plaintiff,                            Bowman, M.J.
          v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


**MEMORANDUM OPINION AND ORDER**

Plaintiff filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.[2] As explained below, the Court will REVERSE and REMAND the ALJ's finding of non-disability, because it is not supported by substantial evidence in the record as a whole.

**I.  Summary of Administrative Record**

In June of 2019, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning June 6, 2019 based upon protein c deficiency, factor 5 leiden deficiency, venous ulcers, transient ischemic attack, dvts, and poor circulation, swelling/pain and numbness in his limbs. (Tr. 229). After his claim was denied initially and upon reconsideration, Plaintiff requested an

_____

[1]Due to significant privacy concerns in social security cases, this Court refers to claimants only by their first names and last initials. *See* General Order 22-01.
[2]The parties have consented to final disposition before the undersigned magistrate judge in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

evidentiary hearing before an Administrative Law Judge ("ALJ"). On April 20, 2021, Plaintiff appeared telephonically with his attorney and gave testimony before ALJ Renita Bivins; a vocational expert also testified. (Tr. 36-76).

Plaintiff was 37 years old on the alleged disability onset date, defined as a younger individual age 18-44, and remained in the same age category on the date of the ALJ's decision. (Tr. 28). He testified he is married[3] and lives in a single family bi-level home with three children. (Tr. 40-41; *see also* Tr. 852). He has at least a high school education, with past relevant work as a trash collector, machine cleaner/janitor, tool and machine maintenance employee, and two "composite" jobs - assembler and forklift operator and delivery driver and forklift operator. (Tr. 29). Plaintiff has not engaged in substantial gainful activity since his alleged onset date, but did receive two weeks of short-term disability pay in June 2019 and long-term disability benefits thereafter. (Tr. 19).

On June 11, 2021, the ALJ issued an adverse written decision that concluded that Plaintiff is not disabled. (Tr. 15-30). The ALJ determined that Plaintiff has the following severe impairments: "chronic venous insufficiency; protein C deficiency; Factor V Leiden disorder; and peripheral neuropathy." (Tr. 18). The ALJ considered but found non-severe the impairment of degenerative disc disease. (*Id*.) Considering all of Plaintiff's severe and nonsevere impairments, the ALJ determined that none, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (*Id*.)

---

[3]*But see* Tr. 23, citing to Tr. 1027, wherein Plaintiff reported residing with a girlfriend.

The ALJ next determined that Plaintiff retained a Residual Functional Capacity ("RFC") that permits him to perform a modified range of sedentary work, sitting six hours in an eight-hour workday and standing and/or walking for two hours, with lifting and carrying abilities up to twenty pounds occasionally and ten pounds frequently. In addition, the ALJ imposed the following non-exertional limitations:

> He could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds. The claimant could occasionally push and/or pull with the bilateral lower extremities. He could frequently balance, stoop, kneel, crouch and crawl. Finally, the claimant must avoid all exposure to unprotected heights of ladders, ropes or scaffolds, hazardous machinery, and with no commercial driving.

(Tr. 19).

Based upon Plaintiff's age, education, and RFC, and considering testimony from the vocational expert, the ALJ determined that Plaintiff could not perform any of his past work, all of which was performed at the light and medium exertional levels. (Tr. 28). Nevertheless, the ALJ found that Plaintiff could perform some sedentary jobs that exist in significant numbers in the national economy, including the representative positions of document preparer, address clerk, and information clerk. (Tr. 29). Therefore, the ALJ determined that Plaintiff was not under a disability. (Tr. 30). The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In this appeal, Plaintiff argues that the ALJ erred: (1) by improperly evaluating the medical opinion evidence, particularly with regard to an alleged need to elevate his legs; and (2) by relying upon VE testimony that did not incorporate the need to elevate his legs or a sit/stand option.

3

## II.     Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted). *See also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

4

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### III.  Relevant Evidence

Plaintiff has taken blood thinners for a clotting disorder since he was 17 years old. Plaintiff claims disability based primarily upon chronic pain, poor circulation, swelling and numbness in his legs, as well as wounds that often require debridement. Since June or July 2014 through the present, he has been prescribed Xaralto. He had a mild TIA but with no issues following a stent placement in 2019. (Tr. 20). His last blood clot was in

2019, but he is monitored for clot fragments in his calf, which remain stable. He takes oxycodone twice a day for pain and rated his left leg pain a three to four, and his right leg pain at a five on a scale of zero to ten. (Tr. 53). However, he also testified that his medicine prevents him from being in constant pain, and he is able to sleep without sleep medication. (Tr. 20, 49). He will take a nap if he can, but usually does not due to his kids. (Tr. 20).

When the ALJ inquired as to what steps he takes to reduce swelling and other symptoms, Plaintiff testified that he wears compression stockings on a daily basis to keep swelling in his legs "down to a minimum." (Tr. 53). He also uses heating pads "[a]lmost daily in the evenings" for "a couple of hours" to help reduce swelling.(Tr. 54). In addition to wearing compression stockings, he tries to elevate his legs above his heart while sitting down "as much as humanly possible." (Tr. 64). However, he explained that elevating his legs helps only "[a] little bit" with swelling and pain, and that because of chronic blood flow issues and the onset of numbness, he "constantly [has] to be moving and adjusting myself." (Tr. 64.; *see also* Tr. 26). He testified: "[L]ike I said, the swelling is something I haven't found a really good way of combating…" (Tr. 64).

Despite his symptoms, Plaintiff reported being able to engage in most daily activities without difficulty, including climbing ten steps to enter and exit his bi-level home, and another ten interior steps to his bedroom. He can prepare simple meals and some household chores such as vacuuming or sweeping small areas, doing laundry, loading the dishwasher and taking out the trash. (Tr. 25). He also drives two or three times per week and makes quick shopping trips. (Tr. 19, 25). Plaintiff spends "a lot" of time attending church in person, at services that last a couple of hours at a time. (Tr. 58). He does not

sit the entire service but gets up to move about as needed. (Tr. 26, 60-61). He spends much of his day reading and studying spiritual materials as well as in ministry and at church activities. (Tr. 26). He also watches television and accesses the internet on his cell phone. (Tr. 58). With help from church member, he started a food pantry out of his garage to feed the homeless. (Tr. 23).

During the hearing, the VE testified that an individual with Plaintiff's RFC as determined by the ALJ could engage in full-time work. The ALJ also inquired whether an individual with a hypothetical RFC as determined, but with an additional requirement to elevate their foot throughout the workday to "footstool height…between six to 12 inches" could still perform the same representative jobs. The VE responded negatively, opining that such an individual could not engage in any full-time sedentary work. (Tr. 69-70). The ALJ sought clarification:

> Q. Okay, so, you're saying that if a person had their foot on a footstool underneath their desk, they could not perform these jobs?
>
> A. That is correct, Your Honor.
>
> Q. Okay. At what height could an individual have their feet elevated under the desk and perform the job whether it was occasionally or frequently?
>
> A. I would say under six inches, Your Honor. Any type of foot apparatus or foot stool where someone would just need to rest their feet, that would be permissible. But again, once the elevation starts to go beyond that, it becomes work preclusive.

(Tr. 70). Thus, the VE testified that an individual who was required to elevate his legs for at least six inches for 100% of the time spent sitting would be precluded from all work.

### IV. Analysis

Plaintiff argues that the ALJ erred in rejecting medical opinion evidence that supports his allegation that he needs to elevate his legs, and similarly erred by failing to

7

incorporate related limitations into the hypothetical posed to the VE. Both claims closely relate to the evaluation of Plaintiff's subjective complaints about his poor circulation and swelling from his clotting disorder. Specifically, Plaintiff testified to greater limitations than determined by the ALJ, including a need to constantly change positions and to elevate his legs. Prior to turning to Plaintiff's two articulated claims, the Court finds it appropriate to review the ALJ's negative assessment of his subjective complaints.

### A. Assessment of Subjective Symptoms

An ALJ's assessment of subjective symptoms is generally given great deference. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In fact, a credibility/consistency determination[4] cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, his testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

The ALJ noted that Plaintiff has long been able to work with chronic health conditions, for which he has received only conservative and routine treatment involving medications and compression stockings.[5] (Tr. 24). In contrast to Plaintiff's testimony that his symptoms have worsened to a level that they are disabling, the ALJ found "an overall treatment course disproportionate to the alleged severity of the claimant's impairments."

---

[4]An ALJ's assessment of subjective symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent with</u> the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added).

[5]The record does not indicate whether more aggressive treatment exists for Plaintiff's conditions.

(Tr. 24). In making that adverse determination, the ALJ rejected Plaintiff's testimony that he must elevate his legs every day to reduce swelling, as well as testimony about his need to constantly change positions in order to increase blood flow.

The ALJ summarized Plaintiff's testimony as follows:

He stated that he wears compression hose to keep the swelling down and at a minimum, but he does have edema when he takes a hose off. He tries to use a heating pad daily in the evenings between 6-7 pm for a couple of hours. The claimant stated that he uses a cane as needed if he has discomfort or swelling, but it is not prescribed….He stated that he sits in a recliner to keep his legs elevated, but it only helps the swelling a little bit because he needs to keep moving due to numbness. The last time he was at the wound center was in 2020 for debridement. He stated that the discoloration on his lower legs is from small scrapes that became sores from past incidents.

…He stated that when standing and/or walking the blood goes to his feet and does not like to pump up, which causes numbness, tingling, pain, and limits his walking to five minutes maximum. He stated that when he sits he gets numbness and tries to find a few minutes to sit and then get the blood flowing. When he bends, stoops or squats, he alleged pain and leg numbness with squatting and leg bending. He stated that he takes quick showers and if he puts his compression hose on right after getting out of bed he has no problems, but if he waits thirty minutes he will need help. He wears compression hose above or below the knee around the house.

(Tr. 20).

In evaluating the subjective testimony, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 21). She found inconsistencies with Plaintiff's relatively active lifestyle, including his ability to engage in most daily activities without difficulty, such as climbing two sets of ten steps at his home, preparing simple meals, performing household chores, driving, and shopping. (Tr. 25). The ALJ also noted that Plaintiff had suffered "multiple recurrent lower extremity thromboses…[and] numerous leg ulcers and…low chronic edema" over the years yet still

was able to maintain competitive employment after the use of compression stockings improved his symptoms.(Tr. 21-22).

The ALJ noted that Plaintiff's alleged onset date coincided with IVC placement in the setting of recurrent blood clots, along with a complaint of sudden onset left arm numbness and weakness a few days later. (Tr. 22). But testing revealed no significant changes that would result in a sudden inability to continue work. While oncologists noted statis changes on his left ankle with compression stockings, the same record showed "marked" improvement in his lower extremity ulcers and the remainder of his physical exam was normal. (*Id*.)

## B. The ALJ's Analysis of the Medical Opinion Evidence

Plaintiff does not specifically challenge the ALJ's rejection of some of his subjective complaints, but instead challenges the ALJ's rejection of three opinions that supported those complaints – specifically, RFC opinions that advised leg elevation to reduce swelling. Two treating physicians plus an agency examining physician opined that Plaintiff should elevate his legs. Additionally, two non-examining agency physicians expressly found that Plaintiff has "significant lower extremity pain and swelling if he is on his feet or sitting" and experiences "[m]ild bilat lower extremity edema" even with compression stockings. (Tr. 85, 111). However, neither of the non-examining physicians endorsed leg elevation. Plaintiff takes issue with the failure of the two reviewing physicians to include a leg elevation limitation or one that allows him to frequently change positions. (Doc. 10 at 19, PageID 1587).

The ALJ found "persuasive" the two non-examining physician opinions, rejecting as "unpersuasive" the opinions of all three examining and treating physicians that Plaintiff

should elevate his legs. Because the ALJ's analysis of the medical opinion evidence is not substantially supported, the Court will remand for further review.

Under the set of regulations that applies to this case, an ALJ is to consider and articulate "how persuasive" each medical opinion is. 20 C.F.R. 404.1520c(b). In determining the level of "persuasiveness," an ALJ must consider five factors, including (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion, *see* 20 C.F.R. 404.1520c(c)(1)-(5), but must explicitly discuss only supportability and consistency. *See* 20 C.F.R. 404.1520c(b)(2); §404.1520c(b)(2) (stating that the ALJ must "explain how [he/she] considered the supportability and consistency factors...."). With respect to the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be." 20 CFR 404.1520c(c)(1). Here, the ALJ's analysis of the supportability factor reflects reversible error. Below, the Court discusses specific errors with the ALJ's analysis of each of the medical opinions.

### 1. Examining Physician Dr. Ray

On September 10, 2019, Plaintiff underwent a consultative examination by Dr. Gary Ray at the request of the state agency. (Tr. 851-858). To the extent that specialization was considered, Dr. Ray is Board Certified in Physical Medicine and Rehabilitation. (Tr. 851). During his examination, Dr. Ray found mild swelling of the left lower leg and moderate swelling of the right lower leg and foot. He observed scar tissue

and discoloration, as well as a decrease in the dorsalis pedis and posterior tibialis pulses. Dr. Ray opined that Plaintiff could lift and carry up to 50 pounds occasionally and 20 pounds frequently, that Plaintiff would be able to sit for an hour at a time, stand for 30 minutes at a time and ambulate for 15 minutes at a time, with only "occasional" bending, stooping, squatting and kneeling, avoidance of crawling or climbing, and activities that could cause lacerations. Importantly, Dr. Ray included a limitation that Plaintiff would need to elevate his legs while sitting due to edema. (Tr. 853).

The ALJ rejected Dr. Ray's RFC opinions as "generally unpersuasive," offering this explanation:

> Dr. Ray's opinion is identical to and/or appears based almost entirely on the claimant's report of his functional abilities. <u>It does not appear Dr. Ray actually relied on his examination findings.</u> Dr. Ray, like the claimant reported, opined that he needs to elevate his legs, but does not indicate height or frequency. Further, based on claimant's testimony elevation of his leg only helps "a little bit" because he needs to keep moving which does not indicate he does so for any measurable length of time. Claimant testified that since his alleged onset date he is able to prepare simple meals, sweep and vacuum small areas, load the dishwasher, makes quick shopping trips, and perform laundry related activities. Also, contrary to Dr. Ray's opinion on climbing, the claimant testified that he is able to climb ten steps to enter and exit his home, as well as the stairway to the bedroom. The claimant also testified he drives on average two to three days a week. The undersigned notes that driving an automobile for any distance requires sufficient concentration and mental skills to follow directions, ability to pay attention, handle changes in routines, and handle stress. Further, driving requires significant physical abilities such as sitting in one place for a period of time, turning the steering wheel, and maneuvering one's body in positions to see in all directions and angles, while simultaneously operating foot controls. Performance of these activities do not support and are not entirely consistent with the degree of limitations set forth by Dr. Ray.

(Tr. 25, emphasis added).

On the one hand, the ALJ is right to criticize Dr. Ray's leg elevation opinion to the extent that he fails to specify either height or frequency. However, on the whole, the ALJ's

analysis reflects reversible error.[6] The ALJ suggests that Dr. Ray's opinions lack supportability because they are "identical to" Plaintiff's subjective report and because "it does not appear Dr. Ray actually relied on his examination findings."[7] But Dr. Ray's opinions were not "identical" to Plaintiff's testimony[8] and – more importantly - he offered supporting explanations independent of Plaintiff's subjective statements.[9] For instance, Dr. Ray plainly stated that his RFC opinions were also supported by Plaintiff's medical history, by his review of relevant medical records, and by his clinical examination findings. He concluded that Plaintiff's "history, physical examination, and review of the medical records are most compatible with" Plaintiff's diagnosis and "thrombotic disease with extensive deep vein thrombosis involving the extremities with the right lower extremity most affected with pain, swelling, and limited motions of the joints." (Tr. 853).[10] Supportive clinical examination findings included mild swelling in the left lower leg and foot and moderate swelling as well as tenderness in the right lower leg and foot, with brownish discoloration at the right lower leg area, and a decrease in his dorsalis pedis and posterior tibialis pulses. (Tr. 853). Dr. Ray noted that Plaintiff was wearing compression stockings

---

[6]With respect to consistency, the ALJ highlighted Plaintiff's testimony that he was able to drive 2-3 days per week, but seemingly ignored (with no citation to contrary evidence) testimony that he could drive for only 10-15 minutes at a time.

[7]The fact that a physician's opinions closely align with a plaintiff's testimony does not necessarily warrant discounting the physician's opinions. There are many occasions in which a physician's opinions will both align with the patient's testimony and will be well-supported by objective evidence and clinical records.

[8]For example, in contrast to Plaintiff's subjective report that he could sit for only 20-25 minutes, Dr. Ray opined that Plaintiff could sit for a full hour at a time.

[9]The belief that Dr. Ray relied wholly on Plaintiff's reports appears to have been drawn from the assessments of Dr. Gary Hinzman and Dr. Maureen Gallagher, the non-examining agency reviewing physicians. Both Drs. Hinzman and Gallagher expressed the identical belief that Dr. Ray "relies heavily on the subjective report of symptoms and limitations provided by [Plaintiff]." (Tr. 86, 111-112).

[10]Dr. Ray discussed a 7/16/19 progress note and documentation from a venogram with intravascular ultrasound that "was consistent with May Thurner syndrome and he has difficulty with standing for long periods of time because of pain." (Tr. 853).

at the time. In short, there appears to be no support for the ALJ's conclusion that Dr. Ray did not "actually rely on his examination findings."

### 2. The Two Non-Examining Agency Physicians

As stated, the ALJ heavily relied upon and found "persuasive" the assessments of two non-examining reviewers who declined to include Dr. Ray's leg elevation opinion. Explaining her analysis of those medical opinions, the ALJ succinctly stated that they were "well supported and come from physicians familiar with Social Security Rules and Regulations," with "no subsequent evidence to warrant a departure." (Tr. 24). But this stated basis for "supportability" is poorly reasoned because Dr. Ray also is an agency-employed physician who is "familiar with Social Security Rules and Regulations."

### 3. Treating Physician Dr. Palascak

In October 2019, treating physician Dr. Joseph Palascak wrote a letter in which he opined that Plaintiff is "severely limited in the type of work he can do" based upon his diagnosis and "very severe bilateral lower extremity postphlebitic syndrome secondary to multiple DVTs related to his Protein C/Factor V Leiden heterozygous state." (Tr. 859). He opined that Plaintiff needs to elevate his legs at 90 degrees "to prevent worsening of his leg pain." (Tr. 859). But he did not opine that Plaintiff must elevate his legs continuously, nor did he specify any amount of time per day during which Plaintiff should elevate his legs. The ALJ rejected Dr. Palascak's opinions as "unpersuasive."

> Dr. Palascak opined that the claimant is unable to stand for more than ten to fifteen minutes at a time due to lower extremity pain. … He indicated the claimant also complained of pain in both legs when walking the length of two rooms or one flight of stairs…. Dr. Palascak opined that when seated, the claimant must keep his legs elevated at ninety degrees and that he is unable to drive more than ten to fifteen minutes at a time….

> Similar to Dr. Ray, it appears Dr. Palascak relied heavily on the claimant's subjective reports versus the objective findings. In fact, on the same day he completed his opinion, Dr. Palascak's review of systems described minimal bilateral leg edema (improved). See Exhibit 11F/p61. Similarly, approximately one week after his opinion, Dr. Palascak noted that the claimant was negative for sensory change, rash, hematoma, and fatigue with minimal bilateral leg edema (improved) and an examination finding the claimant well-developed, well-nourished, in no distress. See Exhibit 11F/p92. Additionally, with regard to elevation, the claimant testified his leg elevation only helps a little bit because he needs to keep moving due to numbness. Therefore, his need to keep moving is not entirely consistent with the opinion, as the claimant's testimony does not support relief from elevation nor that he can do so for an extended period. In fact, the claimant testified that his church attendance is "a lot" with in person service that last a couple of hours and his church is energetic so he can sit and get back up and sit down. The claimant also testified he takes oxycodone, which helps to ease his pain and he is not in constant pain.

(Tr. 25-26).

Plaintiff argues that the ALJ's criticism of Dr. Palascak's RFC opinions is flawed because she cites to Plaintiff's *subjective* report under "Review of Systems" of his bilateral leg edema as "minimal" and "improved." (Tr. 25-26, citing Tr. 920, 951). By contrast, during his physical examination on that day, Dr. Palascak noted that Plaintiff's right lower extremity was more swollen and tender than the left while wearing compression hose. (Tr. 921). Thus, Dr. Palascak's objective clinical findings reflect bilateral swelling with compression stockings, and support his opinion that Plaintiff should elevate his legs to reduce swelling. Like Dr. Ray, Dr. Palascak's opinions also are supported by his review of Plaintiff's medical history and chronic conditions that cause swelling and pain. (Tr. 918-919, 921-922). And Dr. Palascak's opinion was plainly consistent with the objective evidence and multiple clinical records that reflect chronic leg swelling as well as similar leg elevation opinions by other physicians.

15

### 4. Oncologist Dr. Lang

On July 30, 2019, a treating oncologist. Dr. Evan Lang, noted that Plaintiff had experienced "marked improvement" in an ulcer while wearing compression hose. He remarked that Plaintiff "has continued a very active life style and drives a recycling truck for rumpke." (Tr. 1035).[11] The same clinical note includes an assessment that Plaintiff is "able to carry out work of a light or sedentary nature (e.g., light housework, office work)." (Tr. 1036). The ALJ cited Dr. Lang's note as a medical opinion that Plaintiff is capable of "light" work with no reference to leg elevation. (Tr. 24).

Despite the ALJ's treatment of the clinical note as medical opinion evidence that supports her RFC determination, it does not appear that Dr. Lang's note constitutes a formal "medical opinion" because it opines on an issue reserved to the Commissioner without the inclusion of <u>any</u> specific RFC limitations.[12] Pursuant to 20 C.F.R. §404.1513(a)(2), a "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" such as "[y]our ability to perform physical demands of work activities…(including manipulative or postural functions…)." By contrast, mere treatment notes that do not contain clear functional limitations generally are not considered to be medical opinions. *See Bass v. McMahon,* 499 F.3d 506, 510

---

[11]Dr. Lang's reference to Plaintiff's continuation of work for Rumpke at the time appears to have been factually incorrect; the record reflects a cessation of work in June 2019.

[12]It is not at all clear that Dr. Lang's reference to "light housework" or "office work" meant a capacity to perform that work fulltime. Plaintiff asserts that the work status "opinion" is a reference to the oncology "Eastern Cooperative Oncology Group Performance Status" ("ECOG Status"), a prognostic tool used by oncologists to determine how a patient might respond to treatment or clinical trials.

(6th Cir.2007) (treatment note containing observations but no judgment about expected functioning did not qualify as "medical opinion" under the Social Security regulations).

### 5. Treating Physician Dr. Chamberlain

In November 2019, Plaintiff's long-term treating physician, Dr. Chamberlain, completed a medical RFC form that the ALJ rejected as "unpersuasive." Dr. Chamberlain has treated Plaintiff for 30 years[13] for various chronic conditions that cause pain, numbness and swelling in Plaintiff's legs. (Tr. 1031). His RFC form contains many work-preclusive opinions, including but not limited to the opinion that Plaintiff should elevate his legs above his heart with "prolonged sitting." (Tr. 1033; *see generally* Tr. 1031-1034). The ALJ's first reason for rejecting Dr. Chamberlain's opinions was the fact that "there are two noticeably different handwritings on the opinion form, and it is not entirely clear which handwriting is Dr. Chamberlain and which is someone other than Dr. Chamberlain." (Tr. 26-27). However, the Sixth Circuit has held that the completion of an RFC form by someone other than the treating provider does not provide a valid basis for rejecting a medical opinion so long as the medical provider has endorsed and signed the opinion. *See Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546 (6th Cir. 2020).

Other reasons cited by the ALJ as grounds for rejecting Dr. Chamberlain's opinions are less problematic. For example, the ALJ identified "numerous inconsistencies" between Dr. Chamberlain's RFC opinions, such as a puzzling checkmark "no" to a query as to whether Plaintiff's impairments could be expected to last at least twelve months, while simultaneously "effectively opin[ing] that the claimant is disabled." (Tr. 26, citing Tr.

---

[13]While the length of treatment relationship is significant, the regulations require only consideration of that factor; there is no requirement that the ALJ discuss it.

17

1031). The ALJ cited to inconsistencies between Plaintiff's own testimony, in which he often endorsed greater exertional and postural abilities (such as being able to lift 50 pounds and sit or stand for 25 or 30 minutes) versus the highly restricted (5 minute sit or stand) limitations endorsed by Dr. Chamberlain. (Tr. 26). The ALJ also reasonably rejected Dr. Chamberlain's pain-related limitations, given Plaintiff's reported activity level and testimony that he was not in constant pain.

Conversely, the ALJ's rejection of Dr. Chamberlain's leg elevation opinion is not well-supported. Unlike other inconsistencies, the ALJ fails to point out any inconsistencies between Dr. Chamberlain's recommendation that Plaintiff should elevate his legs to reduce swelling and the record. To the contrary, longitudinal clinical records and objective evidence alike reflect near constant chronic swelling and recurrent thrombosis, and Dr. Chamberlain specifically cited to Plaintiff's severe edema. (Tr. 1031).

The ALJ's primary basis for discrediting Dr. Chamberlain's leg elevation opinion was the alleged inconsistency with Plaintiff's own testimony that elevating his legs "only helps a little bit because he needs to keep moving due to numbness." (Tr. 27). The ALJ found Dr. Chamberlain's opinion to be "not entirely consistent with" elevating Plaintiff's legs "for an extended period." (*Id.*) However, Dr. Chamberlain did not opine that Plaintiff must elevate his legs "for an extended period" and even Plaintiff testified that elevating his legs helps at least "a little bit." The ALJ also cited to Plaintiff's ability to ambulate normally without any gait abnormality or assistive device. But that particular finding is not inconsistent with the recommendation of leg elevation.[14] Plaintiff's physicians consistently

---

[14]By contrast, the ALJ's finding does contradict Dr. Chamberlain's opinion that Plaintiff must use a cane or assistive device. (Tr. 27).

18

recommended leg elevation to reduce chronic swelling and pain, and potential clots – not necessarily to increase mobility.

The ALJ further wrote:

> On the same date of his opinion, Dr. Chamberlain noted that the claimant was being treated by specialists who recommended rest, elevation of his legs and continued use of medication. …He did note edema, but normal musculoskeletal range of motion. He also did not advise elevation, but noted that another provider reportedly recommended elevation. See Exhibit 13F/p10-11. Still, there was no indication of the frequency of elevation.

(Tr. 27). The criticism that Dr. Chamberlain "did not advise elevation" is splitting hairs. The RFC form completed and signed by Dr. Chamberlain unequivocally advises leg elevation. And the record cited by the ALJ strongly suggests that Dr. Chamberlain fully concurred with the recommendation of other physicians that Plaintiff elevate his legs when possible based on Dr. Chamberlain's own clear finding of edema.

### C. The ALJ's Hypothetical Question to the VE

Plaintiff's second assignment of error flows directly from his first claim that this case should be remanded for reconsideration of the medical opinion evidence. In his second claim, Plaintiff argues that the ALJ erred by failing to include an RFC limitation that he must elevate his legs during the workday. Based upon the above discussion, the undersigned partially agrees.

Remand is required for re-evaluation of the medical opinion evidence. And yet, the present record is insufficient to support the inclusion of leg elevation throughout the workday, or to mandate a disability finding. Recall that the VE testified only that an individual who was required to elevate his legs more than six inches 100% of the time spent sitting would be precluded from all work. The three examining and treating physicians did not uniformly endorse a particular frequency or height of leg elevation. As

the ALJ repeatedly points out, Plaintiff himself testified that he does not elevate his legs for any significant period of time due to his need to keep moving.[15] Additionally, Plaintiff reported daily activities that were at odds with extended leg elevation. However, the fact that Plaintiff cannot continuously keep his legs elevated or for an extended period is not the same as finding that no leg elevation at all is medically necessary, given the overwhelming evidence of edema despite the use of medications and compression stockings.

On remand, it would be appropriate for the ALJ to consider whether the evidence supports shorter or limited periods of leg elevation, and/or whether any period(s) of elevation must occur during the workday. *See, e.g.*, *Baranski v. Comm'r of Soc. Sec.*, Case No. 20-12304, 2021 WL 6205791, at *4 (E.D. Mich. Dec. 13, 2021) (physician's opinion that patient should elevate legs "whenever possible" did not mandate elevating legs on regular basis throughout workday or specify height; VE testified that it would be acceptable for individual to elevate legs during breaks); *Bornstein v. Comm'r of Soc. Sec.*, Case No. 1:17-cv-220, 2018 WL 3448604, at *9 (S.D. Ohio, June 20, 2018) (discussing case law on leg elevation, adopted at 2018 WL 3439632 (July 17, 2018); *Stumpf v. Comm'r of Soc. Sec.*, Case No. 1:16-cv-991, 2018 WL 718611 (S.D. Ohio Feb. 6, 2018), adopted at 2018 WL 1175294 (affirming ALJ's rejection of treating physician's opinion that plaintiff must elevate both legs at least two hours per day, finding substantial support for ALJ's RFC determination that plaintiff could elevate her legs during regular breaks); *Skierski v. Comm'r of Soc. Sec.*, Case No. 13-14469, 2015 WL 540645, at *2 (E.D. Mich.

---

[15]The ALJ heavily relied upon Plaintiff's testimony that he needs to shift positions to discredit the medical RFC opinions. However, despite crediting that aspect of Plaintiff's subjective report, she failed to incorporate a sit/stand option or similar limitation to permit a change of positions.

Feb. 10, 2015) (affirming restricted range of sedentary work that accommodated blood clotting disorder with RFC that plaintiff be permitted to elevate his legs to hip level during regularly scheduled breaks).

### III.  Conclusion and Order

For the reasons explained herein, **IT IS ORDERED THAT** Defendant's decision be **REVERSED and REMANDED** under sentence four for reconsideration of the evidence consistent with this opinion, including a new evidentiary hearing if appropriate, and that the above-captioned case be **CLOSED.**

_s/Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

21